Argued June 13; reversed July 2; rehearing denied
September 17, 1940

# FRY *v.* BRYANT
(103 P. (2d) 760)

*Oscar Hayter*, of Dallas, for appellant.

*Robert F. Maguire*, of Portland (Maguire, Shields & Morrison, of Portland, on the brief), for respondent.

BAILEY, J.   This is a suit in equity instituted by the respondent, Hettie E. Fry, individually and as executrix of the estate of Daniel J. Fry, deceased, against the appellant, C. C. Bryant, as receiver for The First National Bank in Salem, insolvent, to have determined the ownership of the sum of $25,000 and to obtain the instruction of the court as to what action the respondent as such executrix should take with respect to the said sum of money.   From a decree to the effect that Hettie E. Fry individually is the owner of such money, this appeal is prosecuted.

Daniel J. Fry died testate in Marion county, Oregon, February 15, 1931. In his will he made specific bequests to numerous beneficiaries and bequeathed the remainder of his personal property to his wife, Hettie E. Fry. The will nominated the testator's wife as executrix thereof, and in the event of her death prior to that of the testator or her failure to qualify as executrix, the testator nominated his four children as executors. The widow and children declined to act, and upon the petition of Mrs. Fry The First National Bank in Salem was named adminstrator with the will annexed, and duly qualified as such administrator.

The inventory of the estate listed real and personal property appraised at $83,948.86, all of which was personal property except a one-eighth interest in Rosedale addition appraised at $1,250 and held by The First National Bank in Salem in trust. The personal property consisted of stocks and bonds of corporations, promissory notes appraised at approximately $11,000, and over $1,700 in cash.

On February 3, 1927, Daniel J. Fry signed an instrument guaranteeing to Pacific National Bank of San Francisco the payment of indebtedness of T. A. Livesley, Inc., an Oregon corporation, to that bank up to the amount of $40,000. According to the testimony of Daniel J. Fry, Jr., a son of the decedent, his father's guaranty covered one-half of the total amount of indebtedness of T. A. Livesley, Inc., to that bank, which indebtedness at the time of signing the guaranty was $80,000. At the time of the death of Daniel J. Fry the indebtedness of T. A. Livesley, Inc., to Pacific National Bank was $50,000.

Early in 1932 Pacific National Bank presented to the administrator of the Fry estate a claim of $25,000

against the estate, based upon such guaranty. On March 29 of that year this claim was allowed in the sum of $25,000 by order of court, in which order after a statement that the claim had been presented to the administrator more than six months from the time of probate of the will, it is recited:

"It now appearing to the court that the said claim is regular and that it represents a valid obligation of said estate and that there is sufficient funds and property in said estate after payment is made of the claims presented within said six months period, to make payment of said claim of Pacific National Bank, and that said claim should be allowed and payment thereof made in due course of administration:

"It is therefore ordered, that the claim of Pacific National Bank against the estate of Daniel J. Fry, deceased, be and the same is hereby allowed in the sum of $25,000.00, and that First National Bank in Salem, administrator with the will annexed, do make payment of said claim and for that purpose may sell under the order heretofore made herein sufficient of the personal property of said estate to realize funds to make payment of said claim."

On April 13, 1932, there was filed in the probate proceeding by the administrator of the Fry estate a report of sale to Hettie E. Fry of all the property covered by the inventory of said estate, with the exception of 138 shares of stock in The First National Bank in Salem, appraised at $28,980, the indebtedness of E. F. Slade and Margery Slade appraised at $8,-127.68, a note of W. J. Gilbert appraised at $1,500, cash and travelers' checks amounting to $1,765.86, and four promissory notes appraised as of no value. The appraised value of the property listed in the report was $43,576.31. In addition to the items appearing in the inventory, the report of sale included two

Province of Ontario four and one-half per cent bonds of the face value of $1,000 each. This report reads in part as follows:

"The report of First National Bank in Salem, administrator with the will annexed of the estate of Daniel J. Fry, deceased, would respectfully represent and show unto the court the following facts, to-wit:

"That heretofore and on the 2nd day of April, 1932, the undersigned administrator, pursuant to authority and direction of an order heretofore made by this court, did sell to Hettie E. Fry at and for the price of $25,000.00 all the following described personal property owned by said estate, to-wit: [Here appears lengthy list.] that the said price for which said securities were sold was the best price that could be obtained therefor, and the said sum by said Hettie E. Fry so bidden and offered was the best price obtainable for said property; that with the proceeds of said sale the administrator will discharge the liability of said estate to said Pacific National Bank."

On the day that the report of sale to Mrs. Fry of personal property of the estate (hereinafter to be referred to as "securities") was filed, the probate court entered an order reciting that Mrs. Fry had made the highest and best bid for the securities, and confirmed the sale of the said securities to her for the price of $25,000.

On May 27, 1932, there was filed in the probate proceeding a receipt signed by Hettie E. Fry, reading as follows:

"In accordance with an order heretofore executed by this court, The First National Bank in Salem, Oregon, as administrator with will annexed of the estate of Daniel J. Fry, deceased, did sell on the 2nd day of April, 1932, to Mrs. Hettie E. Fry, certain securities listed in a report of sale heretofore made, and pursuant thereto, the said securities have this 24th day of May

been delivered to the said Hettie E. Fry, as follows:
\* \* \*''

Then appears a list of the personal property described in the report of sale.

No actual payment of the $25,000 or any part thereof was made by Mrs. Fry to the administrator of the estate. Most of the securities sold to her by the administrator were in the possession of Pacific National Bank of San Francisco, held by that bank as collateral security for the decedent's guaranty. The securities which were in the possession of the administrator were either turned over by it to Mrs. Fry or at her request were sent to Pacific National Bank. Under date of May 26, 1932, The First National Bank in Salem sent a number of the certificates of stock belonging to the estate to Pacific National Bank. In the accompanying letter of transmittal it was stated that Mrs. Fry was depositing the securities with Pacific National Bank ''as collateral to her guarantee of the obligation of T. A. Livesley, Inc.''

Orders, apparently twenty-eight in number, were procured from the probate court authorizing transfer of the securities to Mrs. Fry. By virtue of such orders the corporations issuing the various stocks caused the certificates for such stocks to be reissued in the name of Mrs. Fry.

On June 18, 1932, Mrs. Fry signed a document which recited that in consideration of credit extended to T. A. Livesley, Inc., she guaranteed to Pacific National Bank the payment of any sum of money owing by T. A. Livesley, Inc., to that bank up to the amount of $25,000.

Mrs. Fry on August 17 of that year borrowed from The First National Bank in Salem the sum of $5,000

and paid to Pacific National Bank the amount so borrowed.

As of August 18, 1932, T. A. Livesley and Edna I. Livesley, his wife, mentioned as "owners" in the instrument to be described, entered into an agreement in writing with E. Hofer & Sons and Hettie E. Fry, referred to in that instrument, together with R. E. Lee Steiner and John H. McNary, as "guarantors", which document among other things recites the following:

"Whereas, heretofore T. A. Livesley and Edna I. Livesley did borrow from Pacific National Bank of San Francisco, California, approximately one hundred thousand dollars ($100,000.00) and, as security for the payment thereof, the guarantors above named, at the request and for the benefit of said T. A. Livesley, did execute to said Pacific National Bank their several individual guaranties whereby said guarantors did guarantee to said bank the payment of the sums of money so borrowed; that thereafter certain payments were made on said borrowings so that the unpaid balance thereof on March 1, 1932, was the sum of fifty thousand dollars ($50,000.00), and that of said sum certain of the guarantors have made payments thereon to the amount and proportion of their respective guaranties, and the other guarantors will contemporaneously with the execution of this agreement make payment of the amount of their guaranties; that as between the parties hereto the sums so paid and to be paid by the respective guarantors were and are the obligations of T. A. Livesley and Edna I. Livesley and not the obligations of any of said guarantors, and it is deemed by all parties hereto that provision be made for repayment by T. A. Livesley and Edna I. Livesley to said respective guarantors of the amounts of money so by them paid, together with other expenses necessarily incurred by said guarantors because of said guarantees; and the parties hereto have agreed upon the manner and means thereof, NOW, THEREFORE,

"The parties hereto, in consideration of the premises, the truth of which is hereby agreed, and in further consideration of the payments so made, do hereby agree to and with each other as follows:- . . ."

It is then provided by the agreement that the owners will repay to the guarantors the sums of money paid by the latter to Pacific National Bank, and in addition any sums that the guarantors "have been or will be compelled to pay because of said guaranty and the liability of the other individual guarantors thereon; that the sums of money so paid and to be paid by said guarantors to Pacific National Bank have been and will be represented by the promissory notes of the owners to the guarantors respectively bearing interest, payable quarterly, at the rate of six per cent per annum, and to be due and payable on demand." The agreement contains other provisions, with which we are not here concerned, referring to the capital stock of T. A. Livesley, Inc.

Under date of August 18, 1932, T. A. Livesley and his wife, Edna I. Livesley, executed and delivered to Mrs. Fry two promissory notes for $12,000 and $13,000, respectively, payable on or before five years after date, with interest at the rate of six per cent per annum.

Not long after the above agreement was executed Mrs. Fry borrowed $14,000 from a bank. She then paid $8,000 to Pacific National Bank and repaid to The First National Bank in Salem the $5,000 which she had previously borrowed from that bank.

On June 12, 1933, Mrs. Fry borrowed $12,000 from Bank of California, in Portland, and with this money paid the balance remaining due to Pacific National Bank.

Late in 1933 The First National Bank in Salem went into liquidation and a receiver was placed in control of its business. On December 28 of that year the bank filed a report as administrator of the Fry estate and its resignation as such administrator, and requested that Hettie E. Fry be appointed executrix *de bonis non* of the estate. On the same day Mrs. Fry was appointed as such executrix, without bond, and duly qualified by filing her oath of office.

The only assets of the estate listed by The First National Bank in Salem in its report as administrator were the promissory notes of E. F. Slade and Margery Slade, his wife, 138 shares of the capital stock of The First National Bank in Salem and a small amount of cash. The report also stated that the stock of that bank was of no value.

On the day next following the appointment of Mrs. Fry as executrix there was paid by T. A. Livesley & Company, an Oregon corporation, to Bank of California, in Portland, $12,040, which was received by that bank in discharge of Mrs. Fry's note to it for $12,000 and accrued interest of $40. Mrs. Fry's note was by that bank marked paid on that day and returned to her. On March 13, 1934, there was paid to Mrs. Fry by the check of T. A. Livesley & Company the sum of $13,781.69, which was applied by Mrs. Fry in payment of the note given by T. A. Livesley and his wfe for $13,000, together with interest on such note and other expenses to which Mrs. Fry had been put to pay the indebtedness to Pacific National Bank.

The bank stock owned by Daniel J. Fry at the time of his death was appraised at $210 a share, or an aggregate value of $28,980 for the 138 shares. In April of the following year, when the question arose of the

sale of assets of the estate, this stock could not be sold at the appraised value, or even at its par value of $100 a share. There was in fact, according to Mr. Fry, Jr., no market for the stock. Moreover, this same witness testified that it was then the opinion of the president and the attorney for the bank "that the stock should not be sold under any circumstances owing to the fact that Father had been so interested in the bank that it would have a detrimental effect on the stockholders and on the depositors". The promissory notes of Mr. and Mrs. Slade were of no value at the time of the sale of assets to Mrs. Fry. Therefore, practically all the assets of the estate of any value were transferred to Mrs. Fry.

In the liquidation of The First National Bank in Salem it was found that the assets of that bank were insufficient to pay the depositors in full. The receiver first made an assessment of 50 per cent on all the stockholders, and later an additional 50 per cent assessment. He demanded payment of $13,800, of the Fry estate. As there were no assets in the estate to pay this sum, the receiver of the bank demanded that Mrs. Fry account to the estate for the $25,000 which had been paid to her or on her account by T. A. Livesley & Company. For the reason that Mrs. Fry in her individual capacity claimed this sum as her own, it was asserted by the receiver that her claim was inconsistent with her duty as executrix of the estate and that she should resign as such executrix in order that the question of the ownership of this fund might be determined. Instead of resigning, Mrs. Fry individually and as executrix instituted this suit against the receiver of The First National Bank in Salem, the only creditor of the estate.

The alleged right of Mrs. Fry individually to this money is thus set forth in the complaint:

"During the months of March and April, 1932, conferences and negotiations were had between representatives of plaintiff, as an individual, the said First National Bank in Salem, as such administrator, and said Pacific National Bank of San Francisco, California, which conferences and negotiations culminated in an agreement wherein and whereby plaintiff individually promised and agreed to accept, assume and discharge the liability of said Daniel J. Fry, deceased, under said contract of guaranty, and any and all responsibility and liability of said estate by reason of claims arising out of the same, and to pay to said Pacific National Bank of San Francisco, Calfornia, at least $25,000 on the indebtedness of T. A. Livesley, Inc., to said bank, and to discharge the liability of the said Daniel J. Fry, deceased, his administrator and estate to said Pacific National Bank arising from and by reason of said guaranty; and in consideration thereof said administrator agreed to assign and transfer to plaintiff certain stocks and other securities owned by said estate, together with any and all rights of said estate in any way arising out of or connected with the obligation of said T. A. Livesley, Inc., on said note to Pacific National Bank of San Francisco, California, which assets and rights so transferred were then worth substantially less than $25,000. Thereafter, pursuant to said agreement, The First National Bank in Salem as such administrator, assigned and transferred said stocks and securities to plaintiff.

"In the performance of said contract, Hettie E. Fry, individually in writing guaranteed to said Pacific National Bank of San Francisco, California, the indebtedness present, past or future of the said T. A. Livesley, Inc., to said bank up to the amount of $25,000, together with interest thereon and reasonable attorney's fees in case of suit on said indebtedness or on said guaranty, and thereafter was compelled to and did fully pay and discharge the said contract of guar-

72

anty, and by such payment did fully satisfy and discharge any and all liablity of said Daniel J. Fry, deceased, and his said estate, arising out of the guaranty given by said Daniel J. Fry, deceased, to said bank. Plaintiff in her individual capacity duly kept and performed all of the terms of said agreement on her part to be performed.

"In the latter part of the year 1933 and early in 1934, T. A. Livesley, Edna I. Livesley and T. A. Livesley & Co., an Oregon corporation, paid to Hettie E. Fry individually and for her benefit the sum of $25,000."

The answer denied the allegations hereinabove set out as to the agreement between Mrs. Fry and the administrator of the estate, and set forth affirmatively the proceedings had in the probate court concerning the sale of the securities to Mrs. Fry. The affirmative answer also contained the following averments:

"At all times herein mentioned the majority of the capital stock of T. A. Livesley, Inc., was owned and held by T. A. Livesley, and said corporation was under the control of and was controlled by said T. A. Livesley. The said T. A. Livesley likewise owned and held a majority of the stock of T. A. Livesley & Co., another corporation, and had control of and did control said corporation. The said corporations were organized, maintained and in business for the convenience and benefit of said T. A. Livesley in the conduct of his individual affairs. The debts and liabilities of T. A. Livesley, T. A. Livesley, Inc., and T. A. Livesley & Co., were indiscriminately paid out of funds of said T. A. Livesley and said corporations, or either or any of them."

T. A. Livesley owned 4,997 of the 5,000 shares comprising the capital stock of each corporation. The three shares in each not standing in his name were qualifying shares of the officers of the respective corporations. T. A. Livesley & Company was not organized until

after the year 1932. It was principally engaged in hop business. The only business in which T. A. Livesley, Inc., was interested was that of constructing, owning and maintaining the First National Bank building in the city of Salem.

■ It is asserted by the plaintiff that the estate has no interest in or right to the $25,000 here involved, for the reason that the money was paid to or on behalf of Mrs. Fry by T. A. Livesley or T. A. Livesley & Company, and that no part of it was paid by T. A. Livesley, Inc. We are satisfied from the record, however, that T. A. Livesley used the two corporations as mere instrumentalities in carrying out his own individual business; that he considered the obligations of T. A. Livesley, Inc., as personal to himself; and that although he might not have been personally liable to Pacific National Bank on the note given by T. A. Livesley, Inc., nevertheless he regarded himself as morally bound to pay it. In the agreement entered into by Livesley and his wife with Mrs. Fry and E. Hofer & Sons it was especially stipulated that Mr. and Mrs. Livesley had borrowed approximately $100,000 from Pacific National Bank of San Francisco, which amount had been reduced to the sum of $50,000 as of March 1, 1932.

The testimony of Daniel J. Fry, Jr., indicates that he looked upon the obligation of T. A. Livesley, Inc., as that of T. A. Livesley, the individual. In speaking of the agreement between his mother and the administrator made in April, 1932, this witness stated that in return for Mrs. Fry's paying the claim of Pacific National Bank she was to have the securities which were turned over to her by the estate "and was to receive any payment that Tom Livesley might ever make on the guarantee."

We have this situation: The money from Pacific National Bank was borrowed in the name of T. A. Livesley, Inc. The agreement of Livesley and his wife with Mrs. Fry and E. Hofer & Sons refers to this money as having been borrowed by T. A. Livesley and his wife. The payment of the notes given by Mr. and Mrs. Livesley to Mrs. Fry was made by check signed with the name of T. A. Livesley & Company.

These facts and the other evidence above mentioned, taken together with the entries in the journal and ledger of T. A. Livesley, Inc., regarding the making of those notes by T. A. Livesley and his wife, and the payment thereof, are sufficient proof that the payments made to Mrs. Fry or on her behalf were referable to the decedent's guaranty given to Pacific National Bank. Therefore, the contention that the payments so made were not in discharge of the obligation of the corporation, T. A. Livesley, Inc., to indemnify its guarantor, is without merit.

We now approach the question of whether or not Mrs. Fry acquired from the administrator of her deceased husband's estate a right of repayment or recovery from T. A. Livesley, Inc., of the amount which she paid to Pacific National Bank. As we construe the allegations of the complaint which are hereinabove set forth, an agreement was entered into between the administrator of the estate and Mrs. Fry whereby Mrs. Fry became substituted in lieu of the decedent as a guarantor of the indebtedness of T. A. Livesley, Inc., to Pacific National Bank, and as a consideration for her undertaking, the administrator transferred to her all, or practically all, the assets of the estate which had any value. On the other hand, the defendant's position is that the assets of the estate were sold through court

proceedings to Mrs. Fry for a consideration of $25,000, and instead of paying this money to the administrator so that it could in turn pay Pacific National Bank, Mrs. Fry undertook to and did pay that sum directly to Pacific National Bank for and on behalf of the estate.

It is argued by the plaintiff that it was not necessary for the administrator of the Fry estate to procure an order of the probate court for the sale of the securities belonging to the estate, in view of a provision in the will reading as follows:

"My executrices and executors shall have, and are hereby given, the right to make sale of any personal property belonging to my estate at such times and on such terms and conditions as to them, in their absolute discretion, shall seem proper, and that in so doing it shall not be necessary to get any order of court so to do nor to secure the confirmation of any sale made, and that the conveyance signed by my executors and executrices in ordinary form shall be sufficient to convey the title to the property therein described."

Attention is then directed to § 11-617, Oregon Code 1930, which provides that when a testator makes provision in his will for the sale or disposition of his estate or any part thereof, "the same may be sold or disposed of as directed, by the executor or administrator with the will annexed, without an order of the court therefor, but he shall be bound to conduct the sale and make a return thereof in all respects as if it were made by order of the court, unless there are special directions in the will concerning the manner and terms of sale, in which case he shall be governed by such directions in such respects".

The plaintiff contends that the provision of the will above quoted and the statute last above mentioned conferred upon the administrator ample authority to

enter into the agreement which she asserts was effected between herself and such administrator.

■ The alleged agreement between the plaintiff and the administrator did not contemplate an actual sale of the securities to Mrs. Fry. She did not, according to her contention, agree to purchase the securities. All that she was to do was to substitute herself for the decedent as a guarantor of the obligation of T. A. Livesley, Inc., to Pacific National Bank, and for her undertaking so to do she was to receive all, or practically all, the assets of the estate of any value. An agreement of that nature did not amount to a sale, and the administrator had no authority to enter into such a contract by virtue of the provision of the will above quoted or § 11-617, *supra*.

■ There is in the record no note or memorandum of any such agreement between Mrs. Fry and the administrator of the estate. Had there been an agreement as contended for by the plaintiff, it would undoubtedly have been in writing. The plaintiff attempted to supply this lack by introducing in evidence, over the objection of the defendant, a carbon copy of a purported memorandum, unsigned and undated, addressed to The First National Bank in Salem as administrator of the Fry estate. There is no evidence that the original of the document had ever been signed by Mrs. Fry or the administrator, or even seen by either of them. Such an exhibit, therefore, is of no moment in the consideration of this case.

The question remaining for decision is whether or not the right to receive any payment that might be made by or on behalf of T. A. Livesley, Inc., the principal obligor on the indebtedness to Pacifc National Bank, was sold by the administrator to Mrs. Fry.

All the negotiations on behalf of Mrs. Fry were conducted by her son, Daniel J. Fry, Jr. Custer E. Ross was attorney for the Livesley interests, for The First National Bank in Salem, both as administrator and as a banking corporation, and for Mrs. Fry. Mr. Fry, with reference to the indebtedness to Pacific National Bank, testified as follows:

"Q. Now, what, if any, plan was made or proposed to take care of this, and what was the plan? A. The plan was that Mother was to take over the collateral in the estate with the exception of the bank stock and Slade notes.

"The court: What do you mean by 'collateral'? A. I mean the securities in the estate with the exception of the Slade notes and bank stock, and in return for that was to pay the claim of the Pacific National Bank. At that time we knew she would have to raise an additional sum of several hundred dollars in addition to what was coming out of the estate, and in return for that it was definitely understood that she was to receive this collateral and was to receive any payment that Tom Livesley might ever make on the guarantee.

"The court: When you refer to collateral you refer to securities.

"Mr. Maguire: Most of the securities were put in as collateral—we will speak of that as securities rather than collateral.

\* \* \* \* \*

"Q. You suggested that plan? A. I think it just grew out of the conversation that had been taking place.

"Q. Did you talk it over with your mother? A. Yes. Q. What, if any, action did she take as to whether or not she would be willing to do that? A. She decided she would be willing to do it.

"Q. When she made that decision, to whom did you communicate that decision? A. To Custer Ross.

"Q. Did you discuss the matter with any other officer of the bank? A. With Mr. Slade.

\* \* \* \* \*

"Q. Mr. Fry, did any one else but yourself conduct the negotiations which led up to the assumption by your mother of the obligation of the estate—the Fry estate—to the Pacific National Bank, and the details and arrangements relating thereto? A. Yes. Q. Who else? A. Who besides myself? Q. Yes. A. Mr. Slade and Mr. Ross.

"Q. Were they representing your mother? A. Well, they were representing the estate, I presume, at that time.

"Q. I said, was any one else other than yourself representing your mother? A. Oh, no.

"Q. Did your mother take part in any negotiations or conversations with the officers or attorney for the bank or attorney for the estate in regard to that? A. Very little, if any.

       *       *       *       *       *

"Q. Did you ever make any offer, either by Mr. Ross as attorney for the estate and the bank and the bank as administrator of the estate or to any officer of the bank, to purchase these securities for $25,000? A. No, sir."

Mr. Fry further testified that he had not seen any order of the probate court reciting an offer on behalf of his mother to purchase the securities, or any other petitions or orders of the court concerning the sale of the securities by the administrator, and the first knowledge he had of any such order was after the institution on this suit. On cross-examination in this connection he thus testified:

"Q. How much obligation was she to assume in consideration therefor [for the securities]? A. She was to receive these securities and pay Tom Livesley's obligation at the bank.

"Q. How much? A. $25,000. Q. So $25,000 would be the consideration for the securities? A. No, not completely. No, it would be this plus what Tom Livesley would pay."

On rebuttal Mr. Fry's attention was directed to his testimony of the preceding day relating to the offer which he made to The First National Bank in Salem in his mother's behalf, and he was thus questioned:

"Q. * * * I will ask you here what action the bank or its officers took upon that offer—whether or not it was accepted? A. It was accepted.

"Q. And who accepted it on behalf of the bank? A. Mr. Slade."

When cross-examined as to that matter Mr. Fry stated that the offer was not made at a meeting of the directors of the bank, and that he did not know whether Mr. Slade had anything to do with the trust officer's duties.

Mrs. Fry on direct examination gave the following testimony:

"Q. What did you tell Dan you would be willing to do so that the Pacific National Bank claim could be taken care of? Is that sufficiently clear to you now? A. Yes. Q. All right, you tell us about it. A. I told Dan whatever was the best thing for us to do; we wanted to pay that obligation. I felt that we should pay it.

"Q. What did you tell him you were willing to do personally to see that it would get paid? A. Well, I was willing to sacrifice some of my property and my banker was willing and the lawyer was willing for me to have some of those collaterals.

"Q. What, if anything, was said by you or by Dan in his conversation with you as to your getting the benefit of anything that Tom Livesley might be able to pay in the future? A. At that time it looked as if we never would be repaid."

Mr. Fry testified that at the time the securities were turned over to his mother T. A. Livesley, Inc., was insolvent and unable to pay any part of its obliga-

tion to Pacific National Bank. His further testimony on this subject was as follows:

"Q. And the condition of the Livesley personal affairs, what was that? A. We classified everything belonging to Livesley as valueless.

"Q. Did you discuss that matter with Mr. Ross or Mr. Slade or both? A. With both of them and with others."

Mr. Ross, called as a witness for the defendant prior to the rebuttal testimony of Mr. Fry, thus testified:

"Q. At the time this obligation in San Francisco was taken care of through the sale of these securities, was there any discussion about the sale to Mrs. Fry of the claim against T. A. Livesley, Inc., or Mr. Livesley himself, or Livesley & Co.? A. Not with me. Q. You never heard of that? A. Not at that time.

"Q. When, if ever, did you hear of it? A. I think some time after the litigation arose. I might say, however, the details were furnished me by officers of the bank at the time the defense action was made. The talk was probably with them.

"Q. There has been testimony here that the matter was discussed with you, Mr. Ross, at the time these securities were sold to Mrs. Fry. A. I have no memory of anything like that occurring, Mr. Hayter. You are referring now, as I understand it, to the claim that would arise against T. A. Livesley by subrogation when they paid his obligation. Q. Yes. A. I have no memory on it, and I feel certain there wasn't any discussion with me."

E. F. Slade, as a witness on behalf of the plaintiff, after stating that he was president of The First National Bank in Salem during the time of the transfer of securities to Mrs. Fry, was asked whether or not in March or April, 1932, Daniel J. Fry, Jr., had, on behalf of his mother, made any proposal to the bank in regard to the claim of Pacific National Bank against the Fry

estate. He answered that there had been considerable conversation, which he presumed was with Mr. Fry, at the time the claim was filed, and that as a result of that conversation there was an understanding that Mrs. Fry was to "retire that obligation, the portion of the obligation that represented Mr. Fry's guarantee to the Pacific National Bank". Mr. Slade was further examined as follows:

"Q. What, if anything, was she to receive? What rights was she to have? A. It was handled through the trust department of the bank by Mr. Eakin. As to the mechanics of that I am not quite clear, but it was my understanding that in the event she was to pay this guarantee of the Fry estate, that the securities pledged to the Pacific National Bank were to be turned over to her.

"Q. What about the claim which the estate would have against Livesley, Inc.? A. I would say that the manner in which the matter was handled was by the trust department through the bank's attorney. As to any phase of that claim, I am not clear, but I anticipated . . ."

Here the witness was stopped by an objection. He then proceeded thus:

"The deal called for the payment, as I mentioned before, the payment of the guarantee of Mr. Fry by Mrs. Fry. It was my understanding that Mrs. Fry was to receive the securities that were placed in the Pacific National Bank. Whether there were other securites added to that or not, that is not in my recollection at the present time because I didn't handle the transaction, but I presume . . ."

At this point the witness was again interrupted by an objection interposed. Thereafter he testified that the matter was handled through Mr. Eakin and Mr. Ross, the attorney. Cross-examination was waived, and the court then adjourned for noon recess.

Upon the reconvening of court Mr. Slade was recalled by counsel for the plaintiff. After advising the court that he had had a conversation with the witness, counsel for plaintiff examined Mr. Slade as follows:

"Q. What I wanted to find out was what proposal or proposition Mr. Fry made on behalf of his mother in regard to this estate, not what was entered in the court. A. In so far as the conversation between Mr. Fry and myself in the bank regarding the retiring of the obligation to the Pacific National Bank, of which Mr. Fry was a guarantor—a portion of it—was concerned, Mrs. Fry was to receive, as I stated, the securities which were pledged with the Pacific National Bank. In discussing the obligation of T. A. Livesley & Co. to the Pacific National Bank, it was Mr. Fry's understanding in discussing it with me, and I am satisfied it was the bank's understanding—"

The witness was asked to tell what was said, and thus proceeded:

"Mr. Fry stated to me that there might be a possibility at some time of Mr. Livesley's paying Mrs. Fry something on his obligation. At that time it didn't look as though he might be able to pay anything on the obligation, but it was anticipated that he might."

Mr. Slade was thereafter cross-examined as follows:

"Q. Did any one say to you that the matters be so handled that if Livesley paid Mrs. Fry, she would have the money Livesley paid and also have the bonds? A. Yes. Q. Did you tell Mr. Ross that? A. I didn't consult Mr. Ross concerning the handling of the transaction. Q. Did you tell Mr. Eakin that? A. My recollection is that it was understood in the bank—

"Q. Not what you understood, Mr. Slade, but did you tell any trust officer who handled these reports that she was to get these bonds? A. I can't recall a definite statement, but the conversation took place between Mr. Fry, Mr. Eakin and myself. It was not discussed with me alone."

Mr. Eakin was the trust officer of the bank and had charge of the administration of estates. He testified that he received his information regarding Mrs. Fry's offer from Mr. Ross, and that his sole knowledge of the transaction between the administrator and Mrs. Fry was had from Mr. Ross.

■ Mrs. Fry asserts that she purchased from the administrator of her deceased husband's estate the right to look to T. A. Livesley, Inc., for reimbursement on account of the payment of the Livesley obligation to Pacific National Bank. The burden, therefore, rested upon her to prove by a preponderance of the evidence that she did in fact purchase that right.

The parol evidence relating to the transaction between Mrs. Fry and the administrator of the estate has hereinabove been quoted. The documentary evidence on file in the probate court will be summarized briefly.

The claim of Pacific National Bank was approved March 29, 1932, in the sum of $25,000, and the probate court ordered sufficient assets of the estate to be sold to pay that claim. On April 13 of that year the report of the administrator was filed, stating that certain securities of the estate had been sold to Mrs. Fry for $25,000. The report contained thirty-nine items, setting forth in great detail the description of the bonds, stocks and notes that were sold. Following the filing of this report of sale an order was made confirming the sale.

On May 24 Mrs. Fry signed a receipt which recited that in accordance with an order of the court the administrator did, on April 2, 1932, sell to her the securities listed in the report of sale, and that pursuant thereto "the securities have, this twenty-fourth day

of May, been delivered to said Hettie E. Fry''. This receipt also contained a descriptive list of the securities that Mrs. Fry acknowledged receiving. After this sale had been made, orders were procured from the probate court, based upon the record, by means of which Mrs. Fry caused the certificates of the stocks which she purchased to be reissued in her own name.

Nowhere in any of these proceedings is there any mention of a sale to Mrs. Fry of the right of indemnification against T. A. Livesley, Inc. Nor has any written assignment of such right been produced. Before the proceedings were had, according to the testimony of Daniel J. Fry, Jr., the financial status of T. A. Livesley and T. A. Livesley, Inc., had been discussed by him with various individuals and it was the general opinion that both Mr. Livesley and his corporation were insolvent and would continue to be unable to pay any of the indebtedness of T. A. Livesley, Inc., to Pacific National Bank.

Counsel for the plaintiff place much stress upon what they assert was the inadequate value of the securities transferred by the administrator to Mrs. Fry. It is said that the securities had a value, at the time of the transfer, of much less than $25,000. However, no evidence has been introduced as to their actual value. The statement of counsel for plaintiff in the circuit court was that their value did not exceed $18,000 or $19,000. If it had been material to the issues, it would have been a simple matter to show the actual value of the securities at the time of the sale to Mrs. Fry. Most of them, according to a letter dated April 27, 1932, written by The First National Bank in Salem to Pacific National Bank of San Francisco and introduced as an exhibit by the plaintiff, were listed on some exchange,

and the stocks not so listed were said in the letter to be either paying dividends or to be in well operated and well managed corporations.

The real reason, as given by Mrs. Fry, for her concern as to the payment to Pacific National Bank, was that she felt a moral obligation to discharge the guaranty of her deceased husband, inasmuch as her husband had, through his friendship with the president of that bank, induced the bank in the first instance to make the loan to T. A. Livesley, Inc.

The securities which were sold to Mrs. Fry were appraised, as hereinabove stated, at a value in excess of $43,000, not including two $1,000 Province of Ontario bonds. That appraisal was made as of February 15, 1931. Had Mrs. Fry not expected a rise in the value of those securities, she doubtless would have permitted them to be sold on the market, to pay the creditor of the estate. Some evidence of this is contained in a letter of Daniel J. Fry, Jr., to Mr. Gaither, president of Pacific National Bank, at a later date, October 17, 1932.

■ In our opinion, Mrs. Fry has not proved by a preponderance of the evidence that she is entitled to the $25,000 which she received from the Livesley interests. We have here the court record of what purports to have been the transaction between the administrator and Mrs. Fry. We have before us her own receipt filed in the court proceedings. Mr. Fry attempted to explain away the effect of those court proceedings by saying that he had no knowledge of them, although he was acting on behalf of his mother and took to her for signature the receipt which referred to the order of sale. Mr. Fry also testified that he communicated to Mr. Ross his mother's offer to purchase the securities and

along with them the right against T. A. Livesley, Inc., for indemnification. After Mr. Ross denied knowledge of any such offer, Mr. Fry was recalled and testified that his mother's offer was by him communicated to Mr. Slade, president of The First National Bank in Salem, and that the latter accepted it on behalf of the administrator. Mr. Slade's testimony in regard to this matter has hereinabove been set forth and is not at all convincing.

It is admitted by the litigants that no money was actually paid by Mrs. Fry to the administrator, but as we construe the entire record the agreement was that instead of paying the purchase price of the securities to the administrator, Mrs. Fry undertook to pay that amount on behalf of the administrator to Pacific National Bank. By her arrangement with Pacific National Bank she was not compelled to pay immediately the indebtedness of the estate to that bank.

It was urged by the defendant in the circuit court and is insisted here that much of the testimony to which we have referred and which was admitted over the defendant's objection was inadmissible as tending to vary the court records, which records, the defendant contends, are conclusive as to the transaction between Mrs. Fry and the administrator. Since the court records do not show that Mrs. Fry paid the consideration named in the report of sale, it was necessary to produce extrinsic evidence to show how payment for the securities was made.

Our conclusion that the evidence, taken in its entirety, is insufficient to sustain the plaintiff's contention obviates the necessity of lengthening this opinion with a discussion of our views upon the legal question thus raised by the defendant. Moreover, it is admitted

by the plaintiff that the court records are *prima facie* evidence of the facts therein stated. The presumption raised by those records must be taken into account in determining whether the plaintiff has sustained the burden of proof.

After fully examining the entire record we are of the opinion that the $25,000 here involved does not belong to Hettie E. Fry individually. The decree appealed from is reversed and the cause is remanded to the circuit court with instruction to enter a decree requiring that Hettie E. Fry, the individual, account to Hettie E. Fry as executrix *de bonis non* of the estate of Daniel J. Fry, deceased, for the $25,000 hereinabove mentioned. No costs will be allowed in this court.

RAND, C. J., and ROSSMAN and LUSK, JJ., concur.